IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFESCAN, INC., | No. C 04-3653 SI |
| Plaintiff, | **ORDER RE: CLAIM CONSTRUCTION** |
| v. | |
| ROCHE DIAGNOSTICS CORPORATION, | |
| Defendant. | |

On September 6, 2007, the Court held a tutorial and claim construction hearing in this case. After consideration of the parties' papers and presentations, the Court construes the claims at issue as follows.

**BACKGROUND**

Plaintiff Lifescan, Inc., has brought suit against defendant Roche Diagnostics Corporation, alleging infringement of United States Patent No. 6,174,420 ("the '420 patent"). Roche denied infringement and asserted counterclaims against Lifescan, including invalidity and unenforceability of the '420 patent. Both Lifescan and Roche filed requests for reexamination of the '420 patent, which ultimately resulted in the U.S. Patent and Trademark Office issuing a Reexamination Certificate on January 9, 2007. Broadly speaking, the '420 patent involves technology that is used by people with diabetes to monitor their blood glucose levels.

**LEGAL STANDARD**

Construction of patent claims is to be made by the trial court as a matter of law. *See Markman*

*v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). In determining the proper construction of a claim, the court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id.* at 978 (*citing Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991)). "The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1185 (Fed. Cir. 1998).

Accordingly, although claims speak to those skilled in the art, in construing a claim, claim terms are given their ordinary and accustomed meaning unless examination of the specification, prosecution history, and other claims indicates that the inventor intended otherwise. *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994). Although words in a claim are generally given their ordinary and customary meanings, a patentee is free to act as his own lexicographer provided that the patentee's special definition is clearly stated in the patent specification or prosecution history. *See Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990).

The claims must be read in view of the specification. *Markman*, 52 F.3d at 978. Yet while "claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification maybe read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988). Therefore, the specification can supply understanding of unclear terms, but should never trump the clear meaning of the claim terms. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988). Even "[r]eferences to a preferred embodiment, such as those often present in a specification, are not claim limitations." *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed. Cir. 1988).

Finally, the Court may consider the prosecution history of the patent, if in evidence. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed Cir. 1996). Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims

2

1 discernable from examination of the claims, the written description, and the prosecution history. *See*
2 *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (*citing Vitronics*, 90
3 F.3d at 1583). However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence
4 to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly
5 expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id*.

## DISCUSSION

Claim 1 of the '420 patent is the only independent claim, and it contains all of the disputed claim terms. Claim 1 (as confirmed during the Reexamination) reads as follows, with the five disputed claim terms in bold:

> An electrochemical sensor for analytic determination using a liquid sample, comprising
>
> a substantially flat strip having a thickness, the strip having at least two lateral edges,
>
> **a sample-receiving cell** within the strip,
>
> at least two electrodes **in direct contact** with the cell, and
>
> **a notch** through the entire thickness of the strip in at least one of the **lateral edges** thereof, wherein the notch **is in fluid communication** with the cell and allows entry of the liquid sample into the cell.

'420 patent at 2:1-15 (Reexamination Certificate attached as Lifescan Ex. 1, LF002821).

**I.** "**a sample-receiving cell** within the strip"

Lifescan proposes "a compartment within the strip that receives a liquid sample," while Roche proposes "a cavity within the strip into which the liquid sample (for example, whole blood) enters." The parties dispute whether the "cell" includes the cell walls, or whether the "cell" is limited to the space enclosed by the walls.

The Court largely agrees with Roche's position, and construes this term as "a cavity within the strip into which the liquid sample enters." This construction is the most consistent with the Reexamination, during which the Examiner repeatedly referred to the "cavity/cell." More importantly, during the Reexamination the Examiner found that the prior art Lilja reference (U.S. Patent No. 4,654,197) teaches:

3

> Cavity, i.e., cell, defined by surrounding walls which include a semi-permeable membrane, into which cavity/cell the sample is permitted to enter.
>
> Measuring electrode consisting of two electrodes in contact with the semi-permeable membrane (Fig. 3; col. 4, line 64, through col. 5, line 2). By being in contact with the membrane, which also forms part of the wall of the cavity/cell, and also by measuring properties of the contents of the cavity/cell, the electrodes are in "communication" with the cavity/cell.

Schoedel Decl. Ex. 3 at LF001445. The Examiner rejected claims 1-7 of the '420 patent as being anticipated by Lilja. In order to overcome the Examiner's rejection, Lifescan amended the '420 patent to require that the electrodes be "in direct contact with the cell," rather than simply "in communication with the cell." This change was satisfactory to the Examiner; in the Examiner's view, Lilja's semi-permeable membrane, which "forms part of the wall of the cavity/cell," prevented Lilja's electrodes from being "in direct contact" with the cavity/cell ("[i]n Lilja '197, the electrodes are in contact only with the semi-permeable membrane and are not in any 'direct contact' with the cavity or cell intended to contain the liquid sample"). Schoedel Decl. Ex. 4 at LF002814. Thus, the cell wall was not considered part of the "cell." Accordingly, the Court finds that defining "sample-receiving cell" as the cavity into which the liquid sample enters – and not including the walls surrounding the cavity – is the construction most consistent with the Reexamination.

The Examiner and the '470 specifications use "cell" and "cavity" and "cavity/cell" repeatedly, sometimes interchangeably but sometimes not. The specifications at one point state (Col. 4, l. 26-36) that "the cell comprises" a number of things, including electrodes and specified layered walls. Given the inconsistent usage, any single construction is awkward. However, because the Examiner found that the cell wall in the Lilja reference prevented the electrodes from being "in direct contact" with the cell, the Court finds that the more logical construction of "cell" is "cavity."

**II.**     "at least two electrodes **in direct contact** with the cell"

Lifescan contends that the Court need not construe this term,[1] while Roche proposes "the electrodes contact the cavity directly, without any interposed layers or barriers (such as a semi-

---

[1] Lifescan initially proposed that the Court construe this phrase as "at least two electrodes in direct contact with the sample receiving cell." Lifescan's reply acknowledges that this construction does not define the language at issue, and argues that there is no need to define this term.

4

1 permeable membrane layer)." The Court construes this term as "at least two electrodes in direct
2 physical contact with the cell." During the hearing, both parties agreed that "in direct contact" means
3 direct physical contact.

4 Roche argues that the Reexamination supports its proposed construction because Lifescan added
5 the "in direct contact" limitation in order to overcome the Examiner's rejections based upon the Lilja
6 reference, which included a semi-permeable membrane. However, the Court finds Roche's construction
7 confusing because it does not define "layers," "barriers," and "semi-permeable membrane." Further,
8 the Court finds it unnecessary to provide certain examples of indirect contact because "direct physical
9 contact" provides sufficient guidance.

**III.**   "**a notch** through the entire thickness of the strip"

Lifescan proposes "a small cut through the entire thickness of the strip," while Roche proposes "a small cut into a lateral edge of the strip, such as the notches A, B, or C circled below [with three drawings]." The three drawings are based on Fig. 12 of the '420 patent ("Notch A"), Fig. 8 of Australian Provisional Application No. PN6619[2] ("Notch B"), and Fig. 3i from the 'Crismore '817 patent[3] ("Notch C"). According to Roche, the drawings are "genericized" versions of these figures; the drawings are not exact reproductions of those figures.

The Court declines to define the relatively simple term "notch" by reference to Roche's figures. Roche does not provide any legal or factual support for using its own drawings, based on one figure from the patent-in-suit and two figures from other sources, to construe "notch." Both parties agree that "notch" means "a small cut," and the Court finds that this construction is sufficient.

**IV.**   "in at least one of the **lateral edges** thereof"

Lifescan proposes "in at least one of the two edges on a side of the strip," while Roche proposes "in at least one of the side (perimeter) edges of a strip." The dispute here centers around whether the

---

[2] This is the application that Lifescan is relying upon for its effective filing date.

[3] This patent is part of the prosecution history of the '420 patent.

**United States District Court**
For the Northern District of California

notches can be on any side of the strip – including the ends – or whether the notches can only be located on the long sides of the strip.

The Court defines this term as "in at least one of the edges on a side of the strip." The Court disagrees with Lifescan's limitation of "*the* two edges . . ." because the claim expressly states that the strip has "*at least* two lateral edges." '420 patent at 2:4-5 (Reexamination certificate). Both parties agree that "lateral" means "side," and have included "side" in their proposals. The Court finds Roche's proposal of "(perimeter)" unnecessary and confusing because "perimeter" – which means "the boundary of a closed plane figure" – has a broader meaning than "lateral edge." *See* Merriam-Webster's Online Dictionary, http://www.m-w.com/dictionary/perimeter.

**V.**     "wherein the notch **is in fluid communication** with the cell"

Lifescan proposes "the notch is connected to the sample receiving cell in a way that the liquid sample flows through the notch and into the cell," while Roche proposes "a notch through which fluid can flow to or from the sample-receiving cell" or as a compromise, "the notch is connected to the sample receiving cell in a way that the fluid flows through the notch and to or from the cell." The disputes here are whether "fluid" is limited to liquid or also includes gases, and whether the term "communication" is broad enough to embrace bidirectional flow (i.e., flow to or from the cell).

The Court agrees with Roche's compromise construction, "the notch is connected to the sample receiving cell in a way that the fluid flows through the notch and to or from the cell." The Court finds it unnecessary to further define "fluid," and notes that Lifescan's proposal defining "fluid" as "liquid sample" is inconsistent with the claim language, which uses both "fluid" and "liquid sample." The Court also finds that "communication" allows for bidirectional flow because "communication" suggests an exchange between the notch and the cell. Lifescan argues that the "communication" must be unidirectional because claim 1 requires that the notch "allows entry of the liquid sample into the cell," and refers to the cell as the "sample receiving cell." However, this claim language regarding entry of the liquid sample into the cell does not preclude bidirectional "communication" through the notch.

///

///

6

**CONCLUSION**

For the foregoing reasons and good cause appearing, the Court hereby adopts the constructions set forth above. (Docket Nos. 104 and 106).

**IT IS SO ORDERED.**

Dated: September 11, 2007

SUSAN ILLSTON
United States District Judge